# Richmond

ALPHA BOWMAN HODGE v. LUMBERMENS MUTUAL CASUALTY COMPANY.

January 15, 1962.

Record No. 5348.

Present, All the Justices.

*W. R. Broaddus, Jr.* and *John D. Epperly* (*Broaddus, Epperly & Broaddus,* on brief), for the plaintiff in error.

*Richard C. Rakes* (*Gentry, Locke & Rakes*, on brief), for the defendant in error.

SNEAD, J., delivered the opinion of the court.

Alpha Bowman Hodge, hereinafter referred to as plaintiff, instituted an action against Lumbermens Mutual Casualty Company, hereinafter referred to as defendant, in which she sought a judgment for $9,015.75. She alleged in her motion for judgment that because of injuries she sustained in a collision she had secured a judgment for that amount against Thomas Edward Stone, who was driving an automobile involved in the accident on June 22, 1957, with the permission of the owner, Reece Motor Sales, upon which vehicle defendant had liability coverage at the time, and that the judgment against Stone was uncollectible. In its responsive pleading defendant denied any liability to plaintiff or that there was any coverage available to Stone at the time and place of the accident because he did not have "permission", as legally contemplated in the omnibus clause of a casualty insurance policy, to use the car which was responsible for plaintiff's injuries.

A jury trial began on September 29, 1960. At the conclusion of plaintiff's evidence defendant moved to strike plaintiff's evidence and the motion was overruled. At the conclusion of all the evidence plaintiff's motion for a summary judgment was overruled, and defendant's motion to strike plaintiff's evidence was sustained and summary judgment was entered for defendant. We awarded plaintiff a writ of error. Thus, under the well established rule, we must view the evidence and all reasonable inferences therefrom in the light most favorable to plaintiff. *Mason and Dixon, Inc.* v. *Casualty Co.*, 199 Va. 221, 222, 98 S. E. 2d 702.

On June 22, 1957, about noon, Thomas Edward Stone, a fugitive from justice, parked a 1950 Pontiac automobile about a half block from Reece Motor Sales in Statesville, North Carolina. He had obtained the car by fraud or "trickery" several days prior thereto from Midway Pontiac in Wilkesboro, North Carolina. After visiting a motorcycle shop in the vicinity, Stone walked across the street to Reece Motor Sales' used car lot. His purpose was to purchase a cheap car and go south. He engaged in a conversation with T. Jason Long, a salesman for the company whom he had not met before, concerning the purchase of a used car. He was shown by Long a 1946 Oldsmobile, but "it wouldn't start". Close by was a 1947

Studebaker priced at $85. Long and Stone drove a short distance in it. When they returned to the lot Stone said he agreed to purchase the car and told Long that he did not have sufficient money with him, and that he would have "to go get the money".

According to Stone this transpired at the lot:

"Q. Did he tell you how far you could go?

"A. No; he didn't say how far I could go.

*     *     *     *     *

"Q. What, if anything, did the salesman say to you, Mr. Stone, about the use of the car?

"A. He said if I went anywhere in the car, I would have to put gas in it.

"Q. And what else—what did you say to him then?

"A. Well, I told him that I would put gas in it.

"Q. Did you say anything to him about the distance that you were going?

"A. Yes, sir; I did tell him it was a pretty good ways.

"Q. Did you tell him how far it was?

"A. No, sir; no special mileage.

"Q. You said it was a pretty good ways?

"A. Yes, sir.

"Q. Did you tell him whether or not it was in the State of Virginia?

"A. No, sir; I didn't.

"Q. Did you tell him whether it was—whether or not it was in the State of North Carolina?

"A. No.

"Q. What, if any, other conversation did you have with Mr. Long relative to your taking the automobile with you?

"A. Well, I showed him the bill of sale [conditional sales contract] to the Pontiac and I wanted to get if off the street so I took the Pontiac and put it in his lot.

"Q. Up to that point, you had not shown him the bill of sale to the Pontiac?

"A. No, sir.

"Q. Had you shown him the Pontiac automobile at that time—up to that point?

"A. No, I didn't.

"Q. Had you, or had you not, agreed to purchase the 1947 Studebaker before you showed him the Pontiac?

"A. Yes, sir.

"Q. You had done so?

"A. Yes, sir.

"Q. * * * Was there anything else said with regard to your use of the 1947 Studebaker?

"A. No, sir.

"Q. Did you, or did you not, tell·him that you were going to show it to somebody?

"A. No; I didn't."

When Stone was asked by the court what was said between him and Long on the lot concerning the Pontiac automobile, he replied: "Well, when I got ready to leave in the Studebaker, I told him that I had a Pontiac out there and I wondered if he'd take it and put it on the lot and keep it until I got back. I showed him the bill of sale for it and he said he would. We both rode off in the Studebaker and he got out and put the Pontiac on the lot."

On the other hand, T. Jason Long testified while he was demonstrating the Studebaker Stone told him that "he was driving a truck out of Winston-Salem and that he needed another car to drive backwards and forwards to work or that he wanted one to leave for the wife"; that he indicated the car was suitable and when they returned to the lot Stone said he wanted to get his wife's approval of the purchase, stating that she lived "just outside of town on Highway 115", and that he would leave his Pontiac at the lot until he returned. He further stated that Stone said he would return shortly.

After leaving the lot around 1 p. m. Stone drove approximately two blocks and filled the tank with gasoline. His intention, he said, was to drive to Winston-Salem to obtain the money with which to pay for the automobile and secure a valid title to it prior to his journey south. Just before he reached Elkin, North Carolina, he picked up two hitch-hikers and left them at Elkin where he decided not to go to Winston-Salem because he was afraid he would be apprehended by the police on the fugitive warrant. He then decided to go to Martinsville, Virginia, a distance of about 112 miles from Statesville, obtain the money there from a friend, and return to Statesville and pay for the Studebaker car. On his way he consumed several bottles of beer. About three miles west of Martinsville on Route 58 at approximately 5:15 p. m. he became involved in an accident in which plaintiff was injured. He abandoned the car, after having been told by the driver of a pickup truck which was also involved in the accident that he did not think anyone was injured, and went from Martinsville to Washing-

ton, D. C., to avoid arrest on the fugitive warrant. Around 6 p. m. a representative of Reece Motor Sales informed the police that the Studebaker car had been stolen. Later Stone was apprehended in Jacksonville, North Carolina. When this case was heard Stone was an inmate in the North Carolina State Prison.

The omnibus clause in the liability insurance policy issued to Reece Motor Sales provides in part:

"III. Definition of Insured. The unqualified word 'insured' includes the named insured and also includes (1) * * * and (2) * * * any person while using an owned automobile or a hired automobile and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission, * * *."

The dominant issue presented is whether Stone was, as a matter of law, operating insured's vehicle at the time and place of the accident without the permission of the named insured.

In *State Farm Mut., Etc., Ins. Co.* v. *Cook,* 186 Va. 658, 665, 43 S. E. 2d 863, we said that before a person becomes an additional insured under the omnibus clause, permission to use the vehicle must be expressly or impliedly given for that use. Here plaintiff relies solely upon an express permission allegedly given to Stone by Long, which she contends was in effect at the time and place of the accident in question. She maintains that the evidence shows that Stone was permitted to use the Studebaker car to secure the purchase money for it without any restrictions attached; that her motion for a summary judgment should have been granted, and that in any event the evidence as to permission was sufficient to constitute a jury question.

Defendant argues that the trial court was correct in striking plaintiff's evidence and entering summary judgment for it, because an admitted car thief who is a fugitive from justice on that charge cannot obtain the kind of permission from a used car dealer, with whom he was not acquainted, which would extend coverage to him under the dealer's liability policy when such facts were deliberately withheld from the dealer, and because the evidence shows Stone made material misrepresentations to Long which caused him to part with the Studebaker car and thus any permission given was vitiated. Defendant further argues that if it be conceded, which it was not, that initial permission was given, Stone exceeded the scope of such permission at the time and place of the accident and was thereby barred from coverage under the policy.

The ready answer to defendant's first contention is that there was no duty upon Stone to voluntarily disclose to Long what he was not asked. The duty was upon Long, the salesman, to make inquiry of Stone or investigate from other sources any information he desired before releasing the vehicle. Moreover, the insurance policy does not expressly exclude coverage to a fugitive from justice.

If, however, as defendant contends, permission to use the Studebaker car was procured by fraud, then it was not a true permission contemplated by the omnibus clause in the liability policy. There would be no meeting of the minds under the circumstances and therefore no consent. Fraud perpetrated by a permittee vitiates the alleged assent itself and he becomes a converter of the vehicle the moment he takes possession of it. *Potts* v. *Farmers Mut. Automobile Ins. Co.*, 233 Wis. 313, 318, 289 N. W. 606; *Roehrich* v. *Holt Motor Co.*, 201 Minn. 586, 589, 277 N. W. 274.

In support of this contention defendant asserts that Stone admitted he gave a false address to Long; that Stone admitted he misrepresented to Long that he owned the 1950 Pontiac, and that he admitted he falsely told Long he was a truck driver.

However, Stone testified that he was not asked where he lived and did not volunteer such information. He did state that the false address of 830 Broad Street, Winston-Salem, was in the conditional sales contract for the Pontiac automobile, but, he said, this document was not exhibited to Long until after he had secured permission to use the Studebaker car. Likewise, he said the misrepresentation that he owned the Pontiac automobile was not made until after he had procured permission to use the Studebaker car.

On cross-examination Stone testified as follows:

"Q. Did you tell Mr. Long that you worked as a truck driver?

"A. That's right.

"Q. You did?

"A. Yes, sir.

"Q. And at the time were you working as a truck driver?

"A. Not right at the time.

"Q. You were escaped from the clutches of the law, weren't you?

"A. That's right.

"Q. And you were wanted?

"A. That's right.

"Q. So you misrepresented to him that you were working as a truck driver; is that correct?

"A. That's right."

There was evidence adduced tending to show Stone had worked as a truck driver. His answer to the first question above does not necessarily imply that he told Long he was working as such at the time of the transaction. His answer to the last question does indicate that he had said he was then so employed. However, the entire evidence upon which defendant relies is not sufficient to hold that there was fraud in the procurement of permission to use the Studebaker car, as a matter of law, and this issue was one for the jury to decide.

As has been seen, the evidence of Stone and Long was conflicting. Stone testified that he was given by Long unrestricted permission to use the Studebaker car to obtain the money to pay for it; that he told Long he was going "a pretty good ways", and that he was on his way to Martinsville to secure the money when the accident occurred. On the other hand, Long testified that Stone told him he wanted to take the car to get his wife's approval of the purchase of it, and that she lived just outside of Statesville on Highway No. 115. He further testified that Stone left the Pontiac automobile on the lot and said he would return shortly. Under the evidence in this case it was for the jury to decide whether Stone had permission from the named insured to operate its vehicle at the time and place of the accident, or whether he had exceeded the scope of any permission granted. *Hinton* v. *Indemnity Ins. Co.*, 175 Va. 205, 213, 8 S. E. 2d 279; *Indemnity Co.* v. *Small, Admx.*, 154 Va. 458, 466, 153 S. E. 685.

Over the objection and exception of plaintiff, Long was allowed to testify that had he been told by Stone that he was a fugitive from justice he would not have permitted Stone to take the car. It was improper to admit this evidence, because it was speculative and immaterial to the issues involved.

We find no error in the admission of other evidence that plaintiff complains of here.

Our conclusion is that the trial court properly overruled plaintiff's motion for a summary judgment, and erred in striking plaintiff's evidence and entering summary judgment for defendant.

For the reasons stated, the judgment appealed from is reversed and the case remanded for a new trial.

*Reversed and remanded.*